Chief Judge Fuld.
There is before us for review á determination of the Superintendent of Insurance, the appellant herein, that the petitioners practiced racial discrimination in canceling policies of insurance in the Harlem and Bedford-Stuyvesant areas of New York City. We agree with the Appellate Division, which unanimously annulled such determination, that the Superintendent failed to adduce any evidence establishing that the petitioners engaged in any illegal discrimination in acting as they did.
The petitioners are seven insurance corporations, licensed to transact business in New York, which together comprise a single business enterprise known as 1 ‘ Boyal Globe Insurance Companies They are charged by the Superintendent with violating the prohibition against racial discrimination found in section 40 (subd. 10) of the Insurance Law, by systematically planning to cancel fire insurance policies on commercial properties located in predominantly Negro areas in the City of New York.[1] The petitioners deny the charge and maintain that the cancellation of the policies was purely a business decision, arrived at in light of article 17-B of the Insurance Law.
Article 17-B, enacted by the Legislature in 1968, is entitled “ New York Property Insurance Underwriting Association ”. It was designed, according to the Superintendent of Insurance, “ to make available to all insurable, eligible risks in New York State adequate amounts of fire and extended coverage insurance ”, thereby overcoming “ the natural tendency of individual company underwriting decisions to restrict the writing of risks thought likely to be unprofitable ”. The article creates a “ joint underwriting association”—■ commonly referred to as the New York statutory fire pool—“consisting of all insurers authorized to write * * * within this state, on a direct basis, fire and extended coverage insurance ” (Insurance Law, § 652, subd. 1). It further provides that any person with an insurable interest in property, who has attempted to obtain coverage in the normal insurance market but has been unsuccessful, shall *57 ‘ ‘ be entitled to apply to the association for such coverage ’ ’ (§ 653, subd. 1, par. [a]). If, after investigation, the association determines that the property is insurable and that all previous premiums on the property have been paid by the applicant, it must issue a one-year policy of fire insurance ('§ 653, subd. 1, par. [b]).[2] Membership in the association is mandatory for all insurance companies writing fire insurance in this State, and participating companies share in the profits and losses of the association 11 in the proportion that the net direct premiums of each such member * * * written during the preceding calendar year bear to the aggregate net direct premiums written in this state by all members of the association ” (§ 654, subd. 1; emphasis supplied).
At the time article 17-B became law, on September 1, 1968, the petitioners’ share of the total premiums written by all the members of the association during the preceding calendar year was determined to be 5.61%. This percentage was higher than the percentages of all but two other members of the association. The petitioners, concluding that the association would face a net operating loss and that they would be compelled to pay out a greater percentage of such losses than most other members, decided to reduce their fire insurance business in this State so that ‘ ‘ their ultimate aggregate exposure would not be proportionally larger than most other companies.”[3]
With this in mind, the petitioners, in October of 1968, prepared a “plan of action ”, designed to “substantially reduce [their fire insurance] liabilities in ghetto and/or riot prone areas ”: a total of 6,000 fire insurance policies, which they had written on designated commercial properties located in the areas of Harlem and Bedford-Stuyvesant, would be canceled or not renewed. Those two areas were chosen, according to the petitioners, because they faced a serious threat of civil disturbance *58 not present in other areas and also because much of the property in the two neighborhoods was in a “ dilapidated condition ”. In addition, the petitioners considered themselves “ over-committed ’ ’ in the sale of fire insurance in the larger cities of the nation. Their plan of action was limited solely to their ‘ ‘ commercial line ” fire insurance policies, as distinguished from “personal line ” or “homeowners” policies. Furthermore, no policies were to be canceled on commercial properties equipped with[1] ‘ fire resistive and/or sprinklered lines.”
In November, 1968, the petitioners proceeded to implement the first stages of their plan by mailing 206 fire insurance cancellation notices to the owners of certain commercial properties located in Harlem and Bedford-Stuyvesant. There is no evidence in the record that any of the cancellation notices were sent to Negroes or Negro-owned business enterprises, and it appears that more than two thirds of those property owners receiving notices were either nonresidents of the two areas, corporations or other insurance companies reinsured by the petitioners. The Superintendent of Insurance, in response to a complaint apparently made by an insurance broker, then commenced an investigation into the petitioners’ plan of action, and found, after a hearing, that1 ‘ the Harlem and Bedford-Stuyvesant cancellation project was intended to be responsive to a company-wide concern rather than to any peculiar local or personal situation ’ ’ and that, “ in adopting and carrying out the Pla/n of Action, [petitioners] were motivated by underwriting and business reasons, and not by racial hostility.” (Emphasis supplied.)
Nevertheless, despite these findings, the Superintendent concluded that the petitioners had violated section 40 (subd. 10) by canceling policies on the basis of the race of the residents living in the two areas. He also found that the petitioners had violated section 273 of the Insurance Law, which declares that “ [t]he commission of any one or more of the acts prohibited by * * * subdivision ten of section forty ’ ’ automátically constitutes an unfair insurance practice. The petitioners were ordered “ to cease and desist from giving any further effect to the illegal cancellation plan ’ ’ and were fined $20,600. As noted above, the Appellate Division annulled the determination, declaring that “ careful examination of the record fails to disclose any substantial evidence ” to support it (33 A D 2d 1008).
*59 The record establishes beyond all doubt — and, indeed, the Superintendent acknowledges — that the decision of the petitioners was ‘ ‘ motivated by underwriting and business reasons, and not by racial hostility.” The simple fact seems to be that they did not want to bear a disproportionate burden of the insurance losses paid out under the newly enacted statutory fire insurance pool which, as already indicated, requires all participating members to share profits and losses in proportion to their “ net direct premiums ” written in this State (Insurance Law, § 654, subd. 1). Accordingly, the petitioners made a calculated business decision to reduce their fire insurance business in New York. Concluding that they were over-committed in the sale of fire insurance in Harlem and Bedford-Stuyvesant, and that some of the properties located there were particularly poor insurance risks owing to the threat of civil disturbance and the condition of the neighborhoods, the petitioners decided to cancel certain insurance policies in these two areas. In short, it is clear that their ‘ ‘ plan of action ’ ’ was not based on any desire to discriminate.[4]
Nor may it be seriously argued that the cancellation of the fire insurance policies violated section 40 (subd. 10) on the ground that it had the effect of discriminating against Negroes living in the two areas of Harlem and Bedford-Stuyvesant. (Cf. Griggs v. Duke Power Co., 401 U. S. 424; Reitman v. Mulkey, 387 U. S. 369; Hawkins v. Town of Shaw, Miss., 437 F. 2d 1286.) This argument is strongly refuted by the record and ignores both the existence and the purpose of the statutory insurance pool. In the first place, the petitioners continue to underwrite ‘ ‘ personal line ” fire insurance in Harlem and Bedford-Stuyvesant —which constitutes, by far, the greater part of their business — despite the fact that many other insurers have refused to do so. In the second place, their decision to cancel certain commercial insurance policies simply requires the owners of these policies to look to the statutory pool for insurance. This is precisely the reason that the pool was established. The Superintendent recognized this when he noted that a mandatory pool was the only *60 solution to the problem of insuring property in high risk areas. The fact that the premium rates may be higher in the pool is not, of course, attributable to racial discrimination but, rather, reflects the higher degree of risk undertaken by the members of the pool in insuring the particular property.
In light of the fact that the record unequivocally demonstrates that the petitioners were not motivated by racial hostility in canceling their fire insurance policies, and that the cancellations did not have the effect of discriminating against Negroes, we conclude, as did the Appellate Division, that the Superintendent’s determination was not supported by substantial evidence.
The order of the Appellate Division should be affirmed.

. Section 40 (subd. 10) provides, in pertinent part, that no insurance company “shall make any distinction or discrimination between persons because of race, color, creed or national origin as to the premiums or rates charged for insurance policies or in any other manner whatever”.

. The rates charged by the association “shall he in accordance with filings approved from time to time by the superintendent * “ * based on the association’s loss and expense experience, together with such other information as the superintendent may require ” (Insurance Law, § 653, subd. 3, par. [b]).

. As the petitioners anticipated, the association did operate at a loss. During the first year, the new statutory pool sustained a net operating loss of almost $8,500,000. From its inception (October, 1968) to November 30, 1970, the pool has lost over 19 million dollars.

. Quite obviously, the mere fact that the petitioners’ action may serve a valid commercial or economic purpose will not, in and of itself, render such action permissible, if evidence is at hand demonstrating that they were illegally discriminating against Negroes.