INSURANCE COMMISSIONER OF MARYLAND
ET AL. *v.* ALLSTATE INSURANCE
COMPANY

[No. 205, September Term, 1972.]

\* \* \*

INSURANCE COMMISSIONER OF MARYLAND *v.*
AETNA CASUALTY AND SURETY COMPANY

[No. 212, September Term, 1972.]

*Decided March 28, 1973.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Thomas G. Young, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellants.

*Hamilton O'Dunne,* with whom was *Patrick A. O'Doherty* on the brief, for Allstate Insurance Company, appellee in No. 205.

*Thomas Waxter, Jr.,* with whom were *William A. Fisher, Jr., Benjamin R. Goertemiller* and *Semmes, Bowen & Semmes* on the brief, for Aetna Casualty and Surety Company, appellee in No. 212.

BARNES, J., delivered the opinion of the Court.

In the two appeals, No. 205, September Term, 1972, *Insurance Commissioner of Maryland et al. v. Allstate*

*Insurance Company* and No. 212, September Term, 1972, *Insurance Commissioner of Maryland v. Aetna Casualty and Surety Company,* the same statute, Code (1972 Repl. Vol.) Art. 48A, § 234A, as amended and rewritten by Chapter 789 of the Laws of 1971, is to be construed and the same points of law are to be considered. Both appeals were argued on the same day. We have concluded that we may decide both cases in one opinion after giving the facts in each case.

No. 205, September Term, 1972, *Insurance Commissioner of Maryland et al. v. Allstate Insurance Company*

In No. 205, the Insurance Commissioner of Maryland (Commissioner) had received a complaint from James L. Pierce, an insured under an automobile policy issued by Allstate Insurance Company (Allstate), to the effect that Allstate intended to refuse to renew his automobile policy on November 23, 1971, the anniversary date of the policy. The Commissioner by letter dated November 3, 1971, ordered Allstate to continue the policy in effect until a hearing could be held to determine the appropriateness of Allstate's contemplated action under Art. 48A, § 234A (a). This hearing was held in the Insurance Division on December 9, 1971, before Eugene A. Graham, the Hearing Officer designated by the Commissioner (Hearing Officer).

The testimony before the Hearing Officer indicated that the automobile covered by the policy was not only driven by James L. Pierce but also by his wife, Mary Verdell Pierce. We quote from the Commissioner's Order of January 5, 1972, in regard to the testimony before the Hearing Officer:

"Mr. Kenneth J. Higgins, Underwriting Manager of the Roanoke, Virginia Regional Office of Allstate Insurance Company, stated that the decision to discontinue the coverages was based on two violations and seven claims. There were two vehicles and three operators.

"The violations were:

"April 3, 1967—James Louis Pierce—Speeding—$10 fine.

"March 16, 1968—Mary Verdell Pierce—Reckless Driving.

"The accidents were as follows:

"At 5:20 p.m., August 31, 1967, Mrs. Pierce was driving and her vehicle was hit in rear. Medical payments of $136.13 were paid. There were no other payments or recoveries.

"At 7:10 p.m., March 16, 1968, Mrs. Pierce was driving and hit the claimant's parked car. A summons was issued to the third party for illegal parking. The company paid Collision $94.36 and Property Damage $331.02. There was no subrogation.

"At 2:15 a.m., March 24, 1968, Mrs. Pierce was a passenger in her own car. The driver was making a turn when the vehicle was hit in the rear. The company paid $216.09 Collision and three medical payment claims of $275.75; $312.00 and $50.00. The Collision payment was recovered through subrogation.

"At 1:30 p.m., September 29, 1968, Mrs. Pierce hit a parked car. There was a Property Damage claim of $126.50. No Collision paid.

"At 9:30 p.m., the Pierce's automobile was struck by a hit and run driver. There was a Collision claim of $123.38.

"On October 30, 1970, Mrs. Pierce was making a left turn on St. George Avenue. A car hit the insured's front right fender. The road was wet and it was raining. The police were called, but there is no record of citation on Mrs. Pierce's motor vehicle record for this accident. A collision claim of $90.55 was paid and a Property Damage claim of $539.90.

"On December 16, 1970, the insured's vehicle

was struck by a hit and run driver. The other driver was apprehended by the police. A Collision payment of $51.95 was made. There was no subrogation.

"Mr. Higgins stated that the record indicated that the company could expect a continued pattern of more accidents in the future and possibly of a more serious nature. He felt that it would not be profitable for the company to insure the Pierces' for an additional five (5) years."

The Commissioner indicated in the Order of January 5, 1972, that "[u]pon the foregoing findings of fact," Allstate was in violation of Art. 48A, § 234A (a) in that it "arbitrarily, capriciously or for unfairly discriminatory reasons" issued a notice of intent not to renew the coverages in the policy. The Order further stated:

"With three operators and two vehicles, the possibility of claims would exceed those for one operator with one vehicle. The at fault accidents involved Mrs. Pierce who was a newly licensed operator."

Allstate was ordered to renew the coverages in the Pierce policy.

Allstate filed a timely notice of appeal to the Baltimore City Court from the Order of January 5, 1972, on January 21, 1972, followed by a petition in accordance with Maryland Rule B2 e setting forth its grounds of appeal.

Thereafter, on April 17, 1972, the appeal came before the Baltimore City Court (Harris, J.) for a de novo hearing as provided in Art. 48A, § 40 (4). Mr. Higgins, the underwriting manager of the Roanoke, Virginia Regional Office of Allstate, gave substantially the same evidence he gave before the Hearing Officer and also stated:

"During the period of the policy, in April of 1969, the underwriter reviewed these losses. Actually, the underwriting department reviews all accidents that occur. The policy was reviewed

and, at that time, two underwriters agreed that we should look at this policy prior to renewal. Prior to renewal, in August of 1971, two other underwriters reviewed all of the accidents and violations that occurred under the policy and made a decision that this was in excess of what we would normally expect in a policy, and we were deciding as to renewing for a five year period and we believed that it was not to be to the Company's advantage. We therefore issued a non-renewal notice and we did not renew the policy.

\* \* \*

"An underwriter is a risk selection man from the standpoint of evaluating the premium that is available to us and desirable from the standpoint of past accidents, violations of the use of an automobile, the various drivers of an automobile and he makes a decision as to whether or not the Company can properly insure this particular risk.

\* \* \*

"The underwriter does review practically all changes that occur in the policy of continued profitability. In a situation such as Mr. Pierce, he reviews the claims that do occur, he evaluates them from the standpoint of profitability, and if he judges that we cannot expect the risk to be profitable from what has happened in the past, he does make the judgment in writing as part of the file. He thereafter refers this to another underwriter—another experienced underwriter, and the second underwriter must agree with that original decision. If he does not, it is referred to a third underwriter. In any event, it is two that agree to the decision not to renew or not to issue a particular policy.

\* \* \*

"In this particular case it was actually reviewed twice. It was reviewed in 1969 by two underwriters who, at that time, decided it was more than the average number of accidents which had occurred and they recommended that another review be made prior to renewal. At that time two additional underwriters reviewed the case prior to renewal and their decision was non-renewal.

* * *

"The policy of the Company, in a decision like this, it would be an excessive number of accidents. We are trying to insure the average exposure and company policy dictates that when the exposure goes beyond the average—goes beyond the norm, the risk will not be continued."

He further testified that these accidents exceeded the norm and that Allstate only issued a five-year policy in Maryland which had a significant bearing on its decision not to renew the policy. He also stated that throughout the five-year period of the Pierce policy, the premiums paid amounted to $1,210.30 whereas Allstate paid in excess of $2,000 during that period.

Judge Harris in his carefully considered opinion filed June 5, 1972, concluded that there was no evidence whatever to indicate that Allstate's decision not to renew the policy was based upon " 'race, color, creed or sex.' " He further found that Allstate's decision was based upon their substantial losses from the policy and was not " 'arbitrary, capricious, or unfairly discriminatory.' " He stated that the Commissioner's decision was unsupported by competent, material and substantial evidence in view of the entire record as submitted and was, itself, " 'arbitrary and capricious.' " The Order of the Commissioner was reversed and on June 6, 1972, judgment absolute in favor of Allstate for costs was entered. From this judgment, the Commissioner filed a timely appeal to this Court.

No. 212, September Term, 1972, *Insurance Commissioner of Maryland v. Aetna Casualty and Surety Company*

The Commissioner received a complaint from James Buchanan, a resident of Baltimore City, that Aetna Casualty and Surety Company (Aetna) had notified him that it would not renew his automobile liability policy. By its letter of January 12, 1972, Aetna replied to Mr. Buchanan's request to give reasons for its refusal to renew, as follows:

"The police report concerning your accident of 6-5-71 indicates that you struck the claimant in the rear and left the scene of the accident and that you were apprehended ten blocks away by police. In addition, you refused to take a breathelizer test but were subsequently charged with driving while intoxicated.

"A copy of your Motor Vehicle record dated 7-2-71 shows a violation of 6-5-71 in which you were convicted of 'driving ability impaired,' and fined $300.00. This was in conjunction with the accident of 6-5-71.

"It is our feeling that the information contained in the police report regarding this accident precludes our continuing coverage under your policy, subsequent appeals regarding the conviction notwithstanding.

"It is for this reason that we have chosen not to renew your policy."

After a hearing before Eugene A. Graham, the Commissioner's Hearing Officer, on April 6, 1972, the Commissioner concluded that Aetna had acted arbitrarily and capriciously under Art. 48A, § 234A and directed Aetna to renew the Buchanan policy. Aetna duly perfected an appeal from the Commissioner's Order to this effect to the Baltimore City Court (Prendergast, J.).

Judge Prendergast in his helpful and careful oral

opinion accurately summarized the testimony before the Hearing Officer, as follows:

"... on June 5 of 1971, Mr. Buchanan had left his place of employment, Triangle Chrysler Automobile Agency, and had stopped at a tavern, I believe located on Bonaparte Avenue, not far away. He remained there from one P.M. until 4:50, just ten minutes short of four hours. He had nothing to eat, but admitted having three drinks of whiskey with water. It was not long after that that he was proceeding along 25th Street when he ran into the rear of a standing automobile being operated by Mr. Lloyd Allen. His only explanation for this collision is that his reactions were simply not quick enough, or good enough, to enable him to see an automobile in full view standing in front of him. Following the accident, he knew that the police were being called to the scene, nevertheless, he left the scene, and was apprehended, I believe four blocks away. It was shown that he had been charged with four very serious violations of the motor vehicle code: operating while under the influence of liquor, leaving the scene of an accident, driving while his ability to drive was impaired, and negligent driving. It was shown that he was tried on these cases before Judge Robert Gerstung in the District Court, and found guilty on one of the charges, namely, driving while his ability to drive was impaired. He was fined $300.00 and costs. He took an appeal from that decision, and according to him, the decision was reversed in the Criminal Court and his money paid back to him."

Judge Prendergast then observed:

"The hearing officer evidently concluded that since the decision of the District Court was re-

versed as he was told, that Mr. Buchanan was entirely in the clear, and that it was arbitrary in not issuing the policy. I think that was a rather precipitous judgment, not entirely borne out by the evidence made in the record before him."

Lloyd Allen, whose automobile received the rear-end collision with Mr. Buchanan's car on June 5, testified at the hearing in the Baltimore City Court. Judge Prendergast properly summarized his testimony, as follows:

". . . I am quite impressed by the testimony of a man who knows most about it and is in my judgment unbiased in what he told the Court. That is Mr. Lloyd Allen, the victim of this accident. Mr. Allen said that on the day in question, June 5, last year, he was proceeding east along 25th Street, after attending the commencement exercises of his son. He stopped for a red light at the intersection of Harford Road and was standing still when he was hit in the rear by the automobile driven by Mr. Buchanan, as he described it sounded like a train had hit him. Perhaps this metaphor is inspired by the fact that the scene of the accident is not far away from the Baltimore and Ohio right of way, and he may have been thinking in terms of trains at the moment. In any rate, Mr. Buchanan ordered him to take his hand off the car, refused to give him his driver's license or registration, whereupon Mr. Allen, who says he didn't know him at all, told him he was going to call the police. To do this, he had to go to a nearby filling station, where he put in the call. In the meanwhile, fortunately he had got the license number on Buchanan's car; had he not done so, Mr. Buchanan might have gotten off scott free on all charges, and perhaps the Aetna would have been spared the cost of an accident, and the responsi-

438

bility of a serious claim. But, at any rate, when he came back, Buchanan was gone. The police arrived, according to Mr. Allen, quite promptly, and then he had to tell them this car had disappeared. It was learned it had gone up Harford Road. Afterwards, it was apprehended by the sum of four police cars. Even then, Mr. Buchanan, instead of answering questions, threatened Mr. Allen with some kind of reciprocal action by a high-ranking police official, Wade Poole, but finally, in any event, the case was set in traffic court. Buchanan twice failed to appear, so that third occasion he was tried and found guilty. Mr. Allen was not afforded an opportunity to testify on appeal before Judge Marshall Levin. He said that he has been compensated for his injuries and damage to his car, I presume by Aetna, and that the case is closed."

The record in the Buchanan appeal to the Criminal Court of Baltimore and the proceedings before Judge Levin were introduced into evidence at the hearing in the Baltimore City Court. Judge Prendergast then stated:

"Certainly the incident, as described by Mr. Allen, would warrant any insurance company in declining to underwrite a risk of this nature, certainly dispels any suggestion that Aetna was arbitrary in doing what they did in this instance. But the narrative doesn't stop there. We now come to consider the transcript of the testimony before Judge Levin, and in it, there was a stipulation of some of the facts made by the assistant states attorney, Mr. Horvitz, and concurred in by Mr. Briscoe, counsel—concurred in by counsel for Mr. Buchanan. The agreed statement indicates Buchanan had a strong odor of alcohol on his breath, slurred speech, and needed assistance in standing. It indicated that he had run into the rear of the car, and that his car

proceeded some ten blocks away from the scene before it was apprehended. It was a woefully incomplete stipulation, in view of what Mr. Allen told us here today, but it was certainly sufficient to prove the charge brought against Buchanan of driving while impaired. It was by far the lesser of the numerous charges of which he could have been found guilty. Because of the benevolence of two judges, he was let off on three of them. Mr. Briscoe, his counsel, candidly admitted everything said about him and took the position Mr. Buchanan was a nice man, and for that reason, he should be—the charge should result in finding a probation without a verdict by Judge Levin, who adopted that suggestion, even though he also said, and I quote from his opinion, from his comments, 'and from the facts agreed to, namely, that there was this odor of alcohol, and a strong odor of alcohol, slurred speech, he needed assistance, plus the fact there was an accident warranted the District Court, without question, in finding what it did.' He went on to say that verdict was entirely proper, and all the facts were before the District Court; this implies that not all the facts were before him. I am perfectly satisfied that is true. In the course of his testimony, Mr. Buchanan admitted many of these things, but also said that he had a good record except for various parking tickets, and that he was under the care of a doctor for hypertension, which is nothing more or less than high blood pressure, most people of his age would have anyway. At any rate, Judge Levin frankly said he was giving him a break. It was only because of the benevolence of Judge Levin this case ever arose, I am sure, but I think the time has come for benevolence to come to an end, and I see no reason why there should be any finding of arbitrariness or

capriciousness on the part of the underwriter under all the circumstances as they are known now."

The lower court's decision was as follows:

"I find under the record before me, that there was insufficient evidence before the hearing officer to sustain any charge of arbitrary or capricious action amounting to discrimination of any sort by Aetna in its refusal to renew the insurance contract under date of January 26, this year. Further, I find that the entire record, meaning the record made before the hearing officer, and also the additional facts disclosed at the time of the hearing, that the conduct of Aetna was not arbitrary or capricious. I find no evidence of unjust discrimination on its part against Mr. Buchanan in the refusal of Aetna to continue this risk. I think it was entirely justified and, therefore, the action of the Insurance Commissioner must be reversed and set aside."

A judgment absolute for costs in favor of Aetna was entered on June 26, 1972, from which an appeal was timely taken by the Commissioner on June 29, 1972.

*Opinion of this Court in regard to both appeals.*

We sought to make it clear in *Edelstein v. Nationwide Mutual Insurance Co.*, 252 Md. 455, 250 A. 2d 241 (February 20, 1969) that in Maryland, at the time the case was decided, underwriting was within the exclusive control of the insurance company. We stated:

"It is well established in Maryland and generally that an insurance company has the unqualified right to select the risks it considers profitable to insure and the company is under no obligation to accept an insurance application submitted by its agent or broker."
252 Md. at 461, 250 A. 2d at 245.

There was no statute in force in this State at that time which limited this control. Our quotation from 12 Appleman, *Insurance Law and Practice,* Section 7121 at 154-55 (1943), however, indicated that this exclusive control of underwriting by the insurance company was subject to modification by a valid statutory provision. The quotation was:

> " *'In the absence of statute,* it is purely voluntary on the part of the company as to whom it will insure, and it is under no duty to write insurance for any particular applicant. The insurer is at liberty to choose its own risks and may accept or reject applicants as it sees fit.' " (Emphasis supplied) 252 Md. at 462, 250 A. 2d at 245.

On April 28, 1970, Chapter 417 of the Laws of 1970 was signed by the Governor, effective July 1, 1970, adding, *inter alia,* a new Section 234A to Art. 48A. This provision made it unlawful for an insurer (a) to cancel or refuse to underwrite or renew a particular insurance risk or class of risks for any arbitrary, capricious, unfair or discriminatory reason based in whole or in part upon the race, creed, color, religion, national origin or place of residency of any applicant or policyholder, or (b) to require the existence of special conditions, facts or situations as a condition to its "acceptance or renewal of, a particular insurance risk or class of risks based in whole or in part upon the race, creed, color, religion, national origin or place of residency." A new Section 234C provided that the Commissioner, after a finding in a specific case that the insurer had violated Section 234A, could order the insurer to accept the risk or business, with a right of appeal under Art. 48A, § 40.

Section 234A (a) was rewritten by Chapter 789 of the Laws of 1971 and, as re-enacted, was applicable to both Nos. 205 and 212. It provides:

> "(a) No insurer, agent or broker shall cancel

> or refuse to underwrite or renew a particular insurance risk or class of risk for any reason based in whole or in part upon race, color, creed or sex of an applicant or policyholder or for any arbitrary, capricious, or unfairly discriminatory reason. In the case of a cancellation of or refusal to renew a policy, provided the insured requests of the Commissioner that a review be undertaken of the insurer's action prior to the effective date of termination of the policy, and provided the Commissioner initiates action toward issuance of a finding in accord with § 234C, such policy shall remain in effect until such finding is issued."

It is clear to us that the principal thrust of this legislation was directed toward any action of an insurer in failing to underwrite or renew a particular risk or class of risk for any reason based in whole or in part upon race, color, creed or sex of an applicant or policyholder for any arbitrary, capricious or unfairly discriminatory reason *like* those specifically mentioned, including, but not restricted to, religion, national origin, place of residency or other similar irrelevant considerations. In short, the General Assembly intended to broaden the scope of "arbitrary, capricious, or unfairly discriminatory reason," but within the frame of reference of the specifically mentioned "reasons."

Art. 48A, § 234C in regard to proceedings before the Commissioner and appeals in accordance with Art. 48A, § 40, as enacted by Chapter 417 of the Laws of 1970, remained the same.

Art. 48A, § 40, after setting out the procedure for appeals to the Baltimore City Court from Orders of the Commissioner and provisions in regard to a stay pending appeal and the record on appeal, provides:

> "(4) *Hearing de novo.*—Upon receipt of such transcripts and evidence the court shall hear the matter de novo as soon as reasonably possible

thereafter. Upon the hearing of the appeal the court shall consider the evidence contained in the transcript, exhibits, and documents therein filed by the Commissioner, together with such additional evidence as may be offered by any party to the appeal.

"(5) *Judgment.*—The Court may affirm the decision of the Commissioner or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

"(i)    In violation of constitutional provisions; or

"(ii)    In excess of the statutory authority or jurisdiction of the Commissioner; or

"(iii)    Made upon unlawful procedure; or

"(iv)    Affected by other error of law; or

"(v)    Unsupported by competent, material, and substantial evidence in view of the entire record as submitted; or

"(vi)    Against the weight of competent, material and substantial evidence in view of the entire record, as submitted by the Commissioner and including de novo evidence taken in open court; or

"(vii)    Unsupported by the entire record, as submitted by the Commissioner and including de novo evidence taken in open court; or

"(viii)   Arbitrary or capricious."

In both Nos. 205 and 212, there was no evidence either before the Commissioner or the Baltimore City Court on appeal of any arbitrary, capricious, or unfairly discriminatory reason applied by either Allstate or Aetna in declining to renew the respective policies, based upon race, color, creed or sex of the policyholders or any similar reason. The evidence established that each in-

surer made its decision not to renew upon its established underwriting criteria and for no other reason. The facts in each case abundantly established this and there was no evidence to the contrary. Indeed, as Judges Harris and Prendergast observed, the decision of the *Commissioner* in each case was arbitrary and capricious, rather than the conduct of the two insurers.

We have concluded that in each case the decision of the Commissioner was "unsupported by competent, material, and substantial evidence in view of the entire record as submitted" and was "arbitrary or capricious," both grounds for reversal by the lower court of the decision of the Commissioner in each case by virtue of the express provisions of Art. 48A, § 40 (5) (v) and (viii), already quoted in full.

For a similar case, *see British & Foreign Marine Insurance Co. v. Stewart,* 30 N.Y.2d 53, 330 N.Y.S.2d 340 (1972), where the New York Superintendent of Insurance had determined that seven insurance companies had violated a provision (similar to § 234A) forbidding racial discrimination in underwriting risks. The Appellate Division of the Supreme Court (First Judicial Division) reversed the Superintendent and this decision was affirmed by the Court of Appeals of New York. In an opinion written by Chief Judge Fuld, the Court found that the cancellations of policies in the Harlem and Bedford-Stuyvesant areas of New York City were not motivated by racial hostility, but were made because of the poor risks involved and were based upon sound business and underwriting practices.

Although neither Allstate nor Aetna filed any motion to dismiss the respective appeals upon the possible ground that the Commissioner was not given the right to appeal from an adverse decision of the Baltimore City Court, and the point was not considered in the briefs of any of the parties, the Court has grave doubts that such a right of appeal exists, *cf., e.g., Board of Zoning Appeals for the Town of Elkton v. Guns,* 259 Md. 368, 269 A. 2d 833

(1970) ; *Subsequent Injury Fund v. Pack,* 250 Md. 306, 310, 242 A. 2d 506, 509 (1968) ; *Roeder v. Brown,* 192 Md. 639, 65 A. 2d 333 (1949) ; and *Zoning Appeals Board v. McKinney,* 174 Md. 551, 199 A. 540, 117 A.L.R. 207 (1938).

In view of the absence of any motion to dismiss, any briefing of the subject and only limited argument stimulated by questions from members of the Court, we have concluded that we should decide the cases upon their merits rather than to proceed to consider the question further and possibly to dismiss the appeals, *ex mero motu.* We wish to make it clear, however, that by so doing, we do not intend to indicate in any way that such a right of appeal by the Commissioner exists and the Commissioner in any subsequent appeals during the present state of the law should be prepared to brief and argue before us any such asserted right to appeal.

> *Judgments in Nos. 205 and 212 affirmed; the Insurance Commissioner of Maryland, appellant in each case, to pay the costs in each case.*