# GOVERNMENT EMPLOYEES INSURANCE COMPANY *v.* INSURANCE COMMISSIONER OF MARYLAND

[No. 74, September Term, 1974.]

× * ×

# THE TRAVELERS INDEMNITY COMPANY *v.* INSURANCE COMMISSIONER OF MARYLAND

[No. 136, September Term, 1974.]

*Decided January 14, 1975.*

The causes were argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and O'DONNELL, JJ., and CHARLES E. ORTH, JR., Chief Judge of the Court of Special Appeals, specially assigned.

*Thomas Waxter, Jr.*, with whom were *Joseph A. Schwartz, III* and *Semmes, Bowen & Semmes* on the briefs, and *Daniel Kruger* on the brief in No. 74 only, for appellants.

*William J. Giacofci, Assistant Attorney General*, with whom was *Francis B. Burch, Attorney General*, on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

We are confronted here with appeals in two cases, No. 74, September Term, 1974, *Government Employees Insurance Company v. Insurance Commissioner of Maryland* and No. 136, September Term, 1974, *The Travelers Indemnity Company v. Insurance Commissioner of Maryland*. Since these appeals present identical questions of law and require an application of the same statutory provisions, we shall decide them in one opinion following a recital of the facts in each case.

In broad terms, the issue we are faced with here is whether the action of each insurance carrier in refusing to renew an automobile insurance policy was in compliance with applicable statutory requirements. In both cases, appellee (the Commissioner) held that it was not, and was affirmed on appeal to the Baltimore City Court. We reverse.

## No. 74, September Term, 1974

*Government Employees Insurance Company*
*v.*
*Insurance Commissioner of Maryland*

On December 20, 1972, Edmund F. Schoberg (the insured), a mail carrier residing in Westminster, applied for an automobile insurance policy in a telephone call to appellant, Government Employees Insurance Company (Geico). At that time, in response to a series of questions put to him by a Geico employee, he stated that in only one instance during the preceding three years had he been convicted of, or had he paid a fine for, a driving violation. That violation, the insured indicated, consisted of driving in October 1972 at 55 miles per hour in a 50 mile per hour zone. On the strength of that telephone call, he was issued a temporary binder, but was instructed to complete a written application form on or before January 7, 1973, to avoid the loss of his coverage. On January 2, the insured completed the application and returned it to Geico. Near the top of the form, in conspicuous red print, appeared this warning: "IMPORTANT! ISSUANCE OF A VALID POLICY IS DEPENDENT UPON YOUR TRUE ANSWERS." The form also contained this question: "Indicate *all* driving violations or citations (other than parking) that you or any member of your family have been convicted of, forfeited bail or paid any fines for during the past three years? (Give full details, including approximate dates, on separate sheet.)" (emphasis in original). The answer inserted by the insured was: "Speeding five mi. over limit 10-72."

Since the responses given by the insured purportedly brought him within Geico's underwriting requirements, a

one-year policy was issued effective December 26, 1972. Immediately thereafter, in January 1973, Geico directed a routine inquiry to the Motor Vehicle Administration regarding the insured's driving record. The response revealed that in addition to the previously mentioned violation, which actually had occurred on September 13, 1972, there had been three other infractions within the three-year period preceding the date of application. The report read:

| "Date | Disposition | Description | Points |
|-------|-------------|-------------|--------|
| 4-16-70 | $10.00 | Speeding | 1 |
| 7-14-70 | 15.00 | Speeding | 1 |
| 1-1-72 | | Improper Passing | 1 |
| 9-13-72 | | Speeding | 1 " |

Although each of the four violations had resulted in an assessment of one point by the Motor Vehicle Administration, only the two most recent points were yet viable when the application was made.

No immediate action was taken by Geico in consequence of this newly acquired information. In anticipation of the December 1973 expiration date, however, and well in advance of the forty-five day deadline imposed by Maryland Code (1957, 1972 Repl. Vol.) Art. 48A, § 240AA, Geico wrote to the insured on September 10, 1973, and informed him that it would not renew the policy. As its stated reason for this action, it quoted the question and answer pertaining to the previous violations contained in the application, enumerated the three infractions which had not been disclosed, and then concluded with this statement: "Thus, the decision not to offer to renew your policy was made by reason of your failure to furnish a complete disclosure of information requested by our application and considered necessary to a proper determination as to whether to accept your application initially."

As required by subsection (b)(vi) of § 240AA, the insured was also informed of his right "to protest the proposed action . . ." to the Commissioner. He elected to exercise this

right, and on October 29, 1973, the matter was heard by a Hearing Officer designated for that purpose by the Commissioner.

At the proceeding before the Hearing Officer, a Geico representative testified that it was the practice of his company to insure applicants who had not been involved in more than one accident, and had not committed more than one violation within three years immediately preceding the application; but that a person having two or more of either was "unacceptable." The witness explained:

> "I would prefer to say acceptable rather than eligible because ... we in fact now have no eligibility requirements. He could have one accident and one violation and be acceptable. Conversely, he could have an accident and a violation and be unacceptable. The rule of one accident, one violation, is simply a guide to the underwriter, and it is not a hard and fast rule, or an eligibility requirement. It's a flag that normally someone with one accident, and one violation would not be acceptable but depending on the circumstances he could be qualified to be acceptable."

The insured testified that he had overlooked two of the three undisclosed violations because, in completing the questionnaire, he had associated such violations with the points assessed by the Motor Vehicle Administration, and the points assessed for the first two had by then expired. He had simply forgotten the third violation. Another belated disclosure, divulged by the insured for the first time at the hearing, was that a year prior to submitting the subject application, he had spoken to a Geico employee on the phone about obtaining coverage at that time. He apparently had reported the 1970 violations in that conversation, and was thus informed that because there had been two within the prior three-year period, he was unacceptable. It was also explained at the hearing that Geico is what is known as a "preferred-risk" company. By this was meant that because it offered somewhat lower premiums than do most other

carriers, it must "be very selective in the types of risks" that it does insure.

The Commissioner subsequently found that Geico "[had] not met the burden of proving its proposed action to be *justified* " and therefore disallowed it. (emphasis added). On appeal to the Baltimore City Court, following a hearing, that decision was affirmed. There, as he had before the Commissioner, the Geico representative testified that had the insured made an accurate disclosure on his application, the policy would not have been issued since, "[w]ith four violations on his record, that would not have been considered, by us to be an acceptable record . . . for insurance as far as being a preferred driver."

After carefully tracing the history of § § 234A and 240AA of Art. 48A, the application of which controls the outcome of these cases, Judge Cole, sitting in the Baltimore City Court, said:

> "It should be clear to any reasonable man that the fact that an insured had had an accident or received a number of moving violations would not, *in and of itself,* mean that he was a poor risk for insurance. (emphasis in original).
>
> "Nor would it necessarily follow that the same experience of one motorist would cause him to be ineligible for liability insurance by all insurance underwriters.
>
> "The legislature designated the Commissioner to determine if the insurance company could justify its proposed action and cast the burden on the company to do so.
>
> "While the Courts are loathe, in some instances to set forth a check list, it seems apparent that the Commissioner might consider many factors in determining if the proposed action is *justified*: (emphasis added).
>
> "1.) The rates of the company applied to the attendant risk.

2.) The established guidelines of the company in its underwriting practices.

3.) The intentional falsification of an application by an insured as opposed to an honest mistake.

4.) The frequency of accidents where the insured has been adjudicated to be at fault.

5.) The frequency of accidents where the insured can be determined to be factually at fault.

6.) Frequency of serious moving violations.

"The real test which the Commissioner *should use* in determining if the burden has been met is whether the insurer has demonstrated that it can no longer maintain the insured as a risk under its rating structure. To state the proposition differently: *Does the insurer show by proof that the proposed action is consistent with its underwriting standards?* (emphasis added).

\* \* \*

"As to G.E.I.C.O., it clearly had the right to cancel Mr. Schoberg's policy upon learning that he had made a material misrepresentation. ... As such it waived its right to cancel. Unless G.E.I.C.O. could demonstrate some experience during the term of this policy, which made Mr. Schoberg an unacceptable risk, it should renew the policy. It failed to meet its burden by *justifying* its proposed action." (emphasis added).

No. 136, September Term, 1974

*The Travelers Indemnity Company*
*v.*
*Insurance Commissioner of Maryland*

On March 4, 1972, appellee, The Travelers Indemnity

Company (Travelers), issued a new one-year automobile liability insurance policy to Lloyd St. Rose (the insured) of Takoma Park. Within that month — on March 31 — he sustained a conviction for speeding and his driving record was assessed one point by the Motor Vehicle Administration. On May 24, 1972, within three months after issuance of the policy, the insured was involved in a collision, and received three more points on his record upon a conviction of "failure to reduce speed to avoid an accident." As a consequence of the property damage and personal injury claims which ensued from that incident, Travelers paid out in excess of $2,400 under the policy. Also, because four points had accumulated, the Motor Vehicle Administration found it necessary to issue a warning letter to the insured on July 20, 1972.

Anticipating a renewal of the policy, the insured completed a questionnaire for Travelers on November 21, 1972. In answer to the question, "During the past 12 months have you or any other resident driver been convicted of or forfeited bail with respect to a moving traffic violation as a result of operating an automobile," he indicated "No." He then affixed his signature immediately beneath a declaration that ". . . the information furnished on this form is true to the best of my knowledge." Although manifestly aware of the single May 24 occurrence, Travelers had not been informed of the earlier one, and thus relied upon the response in renewing the policy on the March 1973 anniversary date. Two weeks later, on March 19, the insured committed yet another violation — "exceeding the speed limit by ten or more miles per hour" — for which two more points were added to his driving record. The total accumulation of six points thus led to a hearing and a reprimand by the Motor Vehicle Administration in July 1973.

Seeking a second renewal of his policy, which was to expire on March 4, 1974, the insured again completed a questionnaire in November 1973. Despite the March 19 speeding violation, he represented that he had not committed any traffic violations during the previous 12

months. In the following month, however, Travelers obtained a report of his driving record from the Motor Vehicle Administration, which revealed the violations we have just enumerated. As the evidence subsequently established, it was Travelers' routine policy to obtain such records in alternating years rather than annually, for the sake of economy.

Armed with this newly acquired information, Travelers wrote to the insured on January 11, 1974, stating that it would not renew the policy when it expired on March 4 because of the three violations and the accident. The insured protested the proposed action to the Commissioner whose designated representative conducted a hearing on February 19, 1974.

At the hearing, a witness appearing in behalf of Travelers testified that his company followed a "three incident — two year" principle in weighing prospective renewals of automobile insurance policies. By this, it was meant that "three separate incidents during a two year period constituted a greater exposure than contemplated by our standard rates." Curiously enough, although the insured also testified, no one apparently seemed interested in knowing why he had twice misrepresented his driving record to Travelers. With respect to the occurrences themselves, he not unexpectedly blamed the other operator for the May 1972 accident, and seemed to recall little of the two other violations.

As in the companion case, the Commissioner found that Travelers had "not met the burden of proving its proposed action to be justified" and therefore ordered that it be disallowed. Travelers appealed that decision to the Baltimore City Court where, following a hearing, the decision of the Commissioner was affirmed. In orally announcing its opinion from the Bench, the court quoted from its decision in the *Geico* case and then added:

> "What I intended to convey in those words was that the legislature, in its wisdom, saw fit to impose upon the insurer the obligation, because of

the differences in guidelines and underwriting practices, *to convince the Commissioner what their guidelines were and what their underwriting practices were;* and that it should be so clear an underwriting practice that it would indicate by itself why the insured should be included in this category.

"... [I]t is incumbent upon the Court to make certain that the record spells out ... clearly *what those guidelines are* and *what the underwriting practices are* so that the Court can determine whether the Commissioner was correct in what he did and determine, further, *whether the insured would fit into certain risks patterns*, and whether he was a risk or was not a risk.

\* \* \*

"I cannot say, after reading the testimony and hearing the testimony today, what the underwriting practices are. I get a very clear indication that there is some guideline having to do with points and also convictions, but what the spelled out nature of those convictions would be are not clear to me.

"You would suggest, ... Mr. Waxter, that there must be some room for underwriting judgment, but I suggest to you that to a large extent the legislature had in mind *cutting out or reducing the kind of judgments* which have led to all kinds of practices within the industry. . . .

"I do not understand the evidence to clearly point that out to me, and for those reasons, I cannot say that Travelers has met its burden before the Commissioner, and I will affirm the Commissioner's decision." (emphasis added).

These appeals are from the two decisions of the Baltimore City Court.

As we have already suggested, the outcome of these cases is governed completely by §§ 234A and 240AA of Art. 48A, particularly the latter. For the most part, however, it is a disagreement over what the interplay between those two sections should be that lies at the heart of this contest.

The Commissioner's position is that the word "justified," as used in subsection (f) of § 240AA,[1] establishes a substantive standard to be applied where cancellation or non-renewal of a policy is proposed by an insurance carrier. As a substantive standard, the Commissioner says, it requires the insurer to establish that the reasons assigned for non-renewal "are sufficiently supported by credible evidence," and that "those reasons, once established in fact, are adequate and sufficient to warrant its proposed action when weighed by an unprejudiced mind guided by common sense and by correct rules of law."

What all this means, according to the Commissioner, is that a proposed non-renewal of an automobile liability insurance policy must be disallowed "where the insurance company fails to demonstrate that it can no longer maintain the policyholder as a risk upon consideration of its stated factual grounds for the proposed non-renewal, measured by its own underwriting standards in light of the rates the company is authorized to charge and all other considerations relevant to risk."

In reply, the insurers argue that § 240AA "does not grant the Insurance Commissioner the substantive authority to question reasonable, non-discriminatory underwriting guidelines which are accepted on an industry-wide basis." They contend that § 240AA merely prescribes the procedural requirements which insurers must observe on cancelling or non-renewing insurance policies. The substantive requirements, they maintain, are found elsewhere, particularly in § 234A. The insurers argue that the General Assembly never intended by the mere adoption of § 240AA

---

1. "The insurer shall have the burden of proving its proposed action [non-renewal in this case] to be justified, and, in doing so, may rely only upon the reasons set forth in its notice to the insured."

that the "Insurance Commissioner or a reviewing Court should substitute its judgment of what is a proper underwriting practice . . . ." In short, the Commissioner has not been granted the authority by § 240AA "to decide which study on accidents or violations he prefers or which rating practice or underwriting guidelines he desires."

For reasons that follow, we conclude that the decisions of the Commissioner resulted from an "error of law" on his part, and were also "arbitrary," within the meaning of § 40 (5) of Art. 48A; hence, the court below erred in affirming them.

These cases represent but another episode in the continuing struggle between automobile insurance carriers understandably seeking to avoid substantial claims and the State's efforts to protect the public against various underwriting abuses, which, in the past, have been practiced by some companies. It is important to recognize, therefore, as we said in *Insurance Comm'r v. Allstate Ins.*, 268 Md. 428, 441, 302 A. 2d 200 (1973), that "exclusive control of underwriting by the insurance company [is] subject to modification by a valid statutory provision." But we also said there, quoting from *Edelstein v. Nationwide Mut. Ins.*, 252 Md. 455, 462, 250 A. 2d 241 (1969) and 12 Appleman, *Insurance Law and Practice*, section 7121 at 154-55 (1943): " '*In the absence of statute*, it is purely voluntary on the part of the company as to whom it will insure, and it is under no duty to write insurance for any particular applicant. The insurer is at liberty to choose its own risks and may accept or reject applicants as it sees fit.' " 268 Md. at 441 (emphasis in original).

Prior to 1970, there existed no such statutory regulation of underwriting, cancellation or renewal of automobile insurance policies in Maryland. In that year, the General Assembly enacted by Chapter 417 of the Laws of 1970, a new section 234A to Art. 48A. It proscribed an insurer from (a) cancelling or refusing to underwrite or renew a particular insurance risk or class of risks for any arbitrary, capricious, unfair or discriminatory reason based in whole or in part

upon the race, creed, color, religion, national origin or place of residency of any applicant or policyholder, or (b) to require the existence of special conditions, facts or situations as a condition to its acceptance or renewal of, a particular insurance risk or class of risks based in whole or in part upon the race, creed, color, religion, national origin, or place of residency.

Chapter 789 of the Laws of 1971 repealed and re-enacted § 234A with amendments. We considered those changes, and their meaning, in *Insurance Comm'r v. Allstate Ins., supra,* where we quoted § 234A, as rewritten and as applicable to the cases at bar:

> " '(a) No insurer, agent or broker shall cancel or refuse to underwrite or renew a particular insurance risk or class of risk for any reason based in whole or in part upon race, color, creed or sex of an applicant or policyholder or for any arbitrary, capricious, or unfairly discriminatory reason. . . .' "

We then said:

> "It is clear to us that the principal thrust of this [amendatory] legislation was directed toward any action of an insurer in failing to underwrite or renew a particular risk or class of risk for any reason based in whole or in part upon race, color, creed or sex of an applicant or policyholder for any arbitrary, capricious or unfairly discriminatory reason *like* those specifically mentioned, including, but not restricted to, religion, national origin, place of residency or other similar irrelevant considerations. In short, the General Assembly intended. to broaden the scope of 'arbitrary, capricious, or unfairly discriminatory reason,' but within the frame of reference of the specifically mentioned 'reasons.' " 268 Md. at 442 (emphasis in original).

By Chapter 175 of the Laws of 1969, the General Assembly previously had enacted a new § 240E, subsequently

renumbered as § 240F of Art. 48A, providing that "No policy or contract of motor vehicle liability insurance shall be cancelled or nonrenewed exclusively for the reason of age of the holder of the policy or contract." It is important to note, however, that the Commissioner does not contend that the proposed non-renewals in these two cases violated §§ 234A or 240F. Nor, indeed, could such a contention be successfully maintained. Neither of the reasons assigned for non-renewal, *viz.*, failure to make a complete disclosure or accumulation of traffic violations, brings this case within the ambit of § 234A or § 240F. More importantly, neither the insured in either case nor the Commissioner has suggested that the reasons furnished by the insurers were spurious, or that the latter were actuated by one of the "historic prejudices" proscribed in § 234A or § 240F.

Section 240AA was part of a sweeping overhaul of the automobile liability insurance laws in Maryland enacted by Chapter 73 of the Laws of 1972, effective January 1, 1973. Chapter 73 was noted principally for its creation of the Maryland Automobile Insurance Fund, which was designed to supplant an assigned risk plan. Section 240AA replaced what had been § 240A, which had merely provided for forty-five day notice of cancellation or non-renewal to the insured, and had required that the latter be informed of possible alternatives.

Apart from the inclusion of § 240AA in the broad restructuring of the insurance code, its title, "*Procedure* for cancellation, non-renewal, changes in premium or coverage on motor vehicle liability insurance" (emphasis added), and the various provisions, themselves, would seem to leave little doubt as to its purpose. Among the requirements imposed by § 240AA upon an insurer who cancels or non-renews for reasons other than nonpayment of premium, are that it:

1. Give 45-days notice of its proposed action;
2. Furnish the "insurer's actual reason" for proposing such action. "Generalized terms such as 'personal habits,' 'living conditions,' 'poor morale,'

or 'violation or accident record' shall not suffice to meet the requirements of this section";

3. Provide the insured with notice of the right to replace the insurance through the Maryland Automobile Insurance Fund; and

4. Inform the insured of his right to protest the proposed action and request a hearing thereon before the Commissioner.

As we have indicated, the Commissioner regards the words, "The insurer shall have the burden of proving its proposed action to be justified," contained in § 240AA (f), as a substantive standard to be met by any insurer who proposes to cancel or non-renew a policy. This argument, which was accepted by the court below, interprets these words as imposing upon the insurer a burden to establish that his proposed action is "justified" in terms of its underwriting practices. This would be determined by an analysis of the company's rates, its established guidelines, and the frequency and seriousness of "at-fault" accidents and moving violations.

Thus, the Commissioner reads into the single word "justified" the requirement that the insurance company establish, without reference to any specific statutory standard, that its decision is "justified" in light of its "rate plan, the class or classes of risk for which that plan permits insurance coverage, and the company's loss and expense experience in insuring those risks under its rate plan." In other words, "[t]he insurer reasonably ought to be expected to be able to articulate what class or classes of risk it can insure under its rate plan, and to demonstrate how the particular risk in question falls beyond those coverable risks."

We think that both the Commissioner and the court below have read the simple word "justified" too expansively. As we have repeatedly stressed, the general rule is that the courts may not surmise a legislative intention contrary to the plain language of a statute, nor insert or omit words to make the statute express an intention not evident in its original form.

482

Therefore, in the absence of ambiguity, the courts should, as a general rule, confine themselves to a construction of a statute as written, and not attempt, under the guise of construction, to supply omissions or remedy possible defects in these statutes. *Patapsco Trailer v. Eastern Freight.*, 271 Md. 558, 563-64, 318 A. 2d 817 (1974); *Radio Com., Inc. v. Public Serv. Comm'n,* 271 Md. 82, 94-95, 314 A. 2d 118 (1974); *Scoville Serv., Inc. v. Comptroller,* 269 Md. 390, 306 A. 2d 534 (1973); *Amalgamated Ins. v. Helms,* 239 Md. 529, 212 A. 2d 311 (1965).

That the General Assembly merely intended by § 240AA to prescribe the procedure to be applied in cases of cancellation and non-renewal is clear not only from its title and its contents. When it wished to move beyond the historic prejudices already proscribed by § 234A, it did so in explicit fashion. By Chapter 752 of the Laws of 1974, this amendment was added to § 234A (a), effective July 1, 1974: [2]

". . . No insurer, agent or broker may cancel or refuse to underwrite or renew a particular insurance risk or class of risk except by the application of *standards which are reasonably related to the insurer's economic and business purposes.* At any hearing to determine whether there has been a violation of this section, the burden of persuasion shall be upon the insurer to demonstrate that the cancellation, or refusal to underwrite or renew is *justified under the standards so demonstrated.*" (emphasis added).

It is important to note that this amendment to § 234A uses the word "justified" in reference to a substantive standard, whereas in § 240AA the same word is unaccompanied by any such standard.

It is also significant that when the Legislature chose to expand the substantive standard applicable to cancellation

---

2. Not being effective until July 1, 1974, Chapter 752 came too late to be applicable here.

and non-renewal, it did so by amending § 234A. As the preamble to Chapter 752 expressly states, that enactment, which was prompted by our decision in *Allstate*, is designed to correlate insurance acceptability with "relevant facts of underwriting principles, standards and rules that can be demonstrated objectively . . . ." The inclusion of this substantive standard in § 234A buttresses our view that § 240AA was adopted solely as a repository for the comprehensive procedures governing cancellations and non-renewals; and that the major substantive criteria for such proposed actions were to be found in § 234A. Section 240AA was designed not only to implement the enforcement of § 234A and § 240F, by detailing the procedures which were to regulate cancellations and non-renewals, but was conceived at the same time as an important adjunct to the Maryland Automobile Insurance Fund with which it was simultaneously created.

Having thus rejected the meaning of the word "justified" urged upon us by the Commissioner, we must nevertheless decide what it does mean, and, in any event, whether each insurer met "the burden of proving its proposed action to be justified," based upon the "reasons set forth in its notice to the insured."

A necessary implication of the provision that a non-renewal not be "for any arbitrary, capricious or unfairly discriminatory reason," as those words are used in § 234A, is that a reason actually exist. We think, therefore, that no insurer refusing to renew a policy can avoid running afoul of §§ 234A and 240AA, if the stated reasons for the proposed action are not actual and true. Thus, the insurer must establish that its assigned reason is an actual one, that is, genuine; and that the facts on which it is based are true. In addition, of course, the insurer must comply with the remaining procedural requirements in § 240AA and the substantive standards, including the prohibition of historic prejudices, in §§ 234A and 240F. Only then will the insurer have met "the burden of proving its proposed action to be justified" under § 240AA (f).

Nothing in § 240AA, however, permits the Commissioner

to substitute his underwriting judgment for that of the insurer. Similarly, it is not for the courts to decide whether a driver is a good or poor risk; nor may the courts formulate criteria for the Commissioner to follow in considering whether the action proposed by an insurer is "justified." Such measures, as amply demonstrated by the enactment of Chapter 752, must come from the Legislature. We have clearly indicated that they can originate neither judicially nor administratively.

The Commissioner readily acknowledges that the reasons furnished by each insurer are set forth accurately, and are true and actual. In short, it is conceded that the driving record of the insured was correctly set forth in each case; that each of the events did occur; and that in No. 74, the insured did not furnish a complete list of violations in response to the questionnaire. As we have stressed, no contention is made in either case that the insurer was "arbitrary, capricious or unfairly discriminatory" within the contemplation of § 234A. Nor is it claimed that the insurers have not complied with the procedural requirements prescribed by § 240AA.

Having agreed with the primary contention advanced by the insurers, we decline to accept the invitation extended by them to assume *arguendo* that the word "justified," as used in § 240AA (f), is substantive, and to then hold that, in any event, they have met the burden which would thereby be imposed upon them. Since we do not reach that issue, we also find it unnecessary to consider the constitutional questions that might inhere in such a holding.

Nor do we find any merit in the Commissioner's argument that assuming a material misrepresentation by the insured in No. 74, such materiality was waived by the insurer's failure to cancel the existing policy upon discovering the misrepresentation. Not surprisingly, this argument is unsupported by any citation of authority and deserves little, if any, comment. Suffice it to say that while a point may have been reached beyond which Geico waived any right it may have had to *cancel* its existing policy upon the ground of

misrepresentation, nothing in its decision to refrain from doing so could possibly have constituted a waiver of its right to *non-renew* a wholly new contract.

As the insurers sustained the burden of proving their proposed actions to be "justified," the Commissioner should have dismissed each of the protests in accordance with subsection (g) of § 240AA.

> *Judgments of the Baltimore City Court in each case reversed; orders of the Insurance Commissioner of Maryland reversed; costs to be paid by appellee.*